Neel, Stephen E., J.
Plaintiff MASSPOWER and defendant Massachusetts Municipal Wholesale Electric Company (MMWEC) entered into a long-term power purchase agreement (PPA) in 1990, pursuant to which MMWEC purchased electric power generated by MASSPOWER’s Springfield, Massachusetts, facility. By 2004, deregulation of the New England power supply market, and changes in the operation of that market, had made the PPA economically disadvantageous in MMWEC’s view, and the parties attempted to negotiate a buyout of the PPA.
This lawsuit arises out of the failure of that negotiation, MMWEC’s demand that MASSPOWER seek to operate the facility under the “must-run” provision of the PPA, MASSPOWER’S refusal, and MMWEC’s subsequent termination of the PPA. MASSPOWER sues for breach of contract, breach of the covenant of good faith and fair dealing, violation of G.L.c. 93A, and abuse of process (arising out of an earlier action which MMWEC brought against MASSPOWER).
The case was tried without jury over eighteen days in February and March 2010, followed by closing arguments on July 14, 2010.
PRIOR PROCEEDINGS
The prior proceedings in this case are particularly important to the determination of the matters now before the Court because they bear on what issues were, and were not, to be tried. In 2008 the Appeals Court affirmed judgment for MASSPOWER in the earlier case brought by MMWEC, and reversed a grant of summary judgment for MMWEC in this case. In 2009 this Court ruled on subsequent dispositive motions. Before addressing the parties’ contentions regarding the import of those rulings for this case, it is necessary to set out in some detail what the Appeals Court, andthemotionjudge, decided.
In 2005 MMWEC sued MASSPOWER and others, alleging that MASSPOWER had breached the PPA, breached the implied covenant of good faith and fair dealing, and violated G.L.c. 93A. See MMWEC v. Northern Star Generation LLC et al.[1] SUCV #05-2710-BLS-l (MMWEC Action, or 2005 Action). Following a jury-waived trial, the Court (van Gestel, J.) entered findings and rulings, and ordered judgment for defendants.
In 2007 MASSPOWER sued MMWEC in the present case. The Court (Gants, J.) subsequently allowed summary judgment for MMWEC.
Appeals were taken in both cases and were consolidated before the Appeals Court, which issued a re-script (“Memorandum and Order Pursuant to Rule 1:28”) on November 7, 2008 (Appeals Court decision). The Appeals Court decision affirmed the trial court’s judgment against MMWEC in the MMWEC Action, vacated summary judgment for MMWEC in this case, and remanded this case “for further proceedings consistent with the memorandum and order of the Appeals Court.” Id. at 24.
The Appeals Court notes at the outset that “(b]oth cases involve the interpretation of [the PPA], . . . pursuant to which MMWEC contracted to purchase 7.86 percent of the output from MASSPOWER’S energy generating facility for a term of twenty years.” Id. at 1. The court continues:
For these appeals, we rely on the facts as found by the Superior Court trial judge in his February 20, 2007 “Findings of Fact, Rulings of Law and Order for Judgment,” and on the undisputed facts set out in a second judge’s January 29, 2008 “Memorandum of Decision and Order on Cross-Motions for Summary Judgment,” supplemented where necessary by uncontroverted facts in the trial record and summary judgment materials.
Id. at 1-2 (emphasis supplied).
Accordingly, this Court summarizes below the Appeals Court’s recitation of the pertinent facts found in the MMWEC case, and of the undisputed facts set out in the motion judge’s Memorandum on summaryjudgment in this case, as the starting point for its own findings.[2]
MMWEC filed its complaint against MASSPOWER on June 30, 2005 “in response to a reduction in the frequency with which Masspower’s facility was being selected for dispatch,” i.e., selected to provide power to the New England pool (see discussion below). Id. at 2. The PPA was a contract between “sophisticated and well-represented parties!;] the integration *53 clause in the agreement’s final section prohibited alteration or expansion of matters specifically addressed therein.” Id. Because the facility was “consistently maintained so as to be available for dispatch at all times,” MASSPOWER “did not breach the PPA when the frequency with which the facility was selected for dispatch fell off dramatically after 2005.” Id., 4-5.
The Appeals Court defined and distinguished “economic dispatch,” which was at the heart of the MMWEC Action, from “must-run,” at the heart of the present action, as follows:
The judge properly interpreted “economic dispatch” [under section 4.3 of the PPA] to mean that Masspower was obligated to maintain the facility to be available for dispatch in accordance with the NEPOOL[3] rules for economic dispatch. Pursuant to NEPOOL rules, facilities were selected for economic dispatch by a central system operator, according to the price at which they could generate energy, so that facilities offering cheaper prices for energy on a given day would be selected for dispatch before more expensive units. Under the terms of the PPA, Masspower’s facility was one that would be selected to operate based on its costs. In this manner, the contract distinguished the mode of the facility’s operation from that of a must-run facility, a type of facility that operated at all times regardless of costs.
Id. at 6. Addressing one of the central issues in the MMWEC Action appeal, the court concluded: “We are in full accord with the judge’s conclusion that Masspower’s failure to price its energy so that it would be selected for dispatch on a nearly continuous basis did not constitute a breach of contract [under the ’’economic dispatch" provisions of the PPA]." Id. at 8.
As for the present case, the court summarized the issues decided by Judge Gants on summary judgment as follows:
On May 4, 2007, MMWEC demanded that Masspower seek to have the facility declared a must-run operation, pursuant to section 4.3 of the PPA. Masspower refused, and MMWEC terminated the PPA . . . The must-run provision, in section 4.3 of the PPA, states: “In the event that the [flacility is dispatched at a capacity factor of less than [sixty percent] over a two year period, [sjeller agrees to cooperate with [b]uyer and the other [pjurchasers if they decide to seek to have the [flacility declared ‘must-run’ by NEPOOL.” Termination under the PPA is governed by section 7.1, which gives MMWEC the right to terminate the PPA if Masspower “shall fail in any material respect to comply with, observe, perform or shall default in any material respects upon any obligation under the [agreement, . . . and such failure materially and adversely ]e]ffects[4]” MMWEC. The judge ruled [first[5]] that because there were no other purchasers, as that term was used in the PPA, as of 2007, MMWEC had the unilateral right to seek Masspower’s cooperation in having the facility declared must-run. The judge also ruled [second] that Masspower’s failure to do so constituted a material breach of a material obligation, and [third] that such breach satisfied the “materially and adversely [e]ffects” prong of the PPA’s termination provision, without further proof of harm.
Id. at 12-13.
The court agreed with the motion judge’s first ruling: “we are satisfied, on this record, that, by 2007, there were no ‘other purchasers’ under the terms of the PPA,” id. at 13, and therefore no impediment to MMWEC’s “seek[ing] to have the Masspower facility declared must-run.” Id. at 17. Thus, as MASSPOWER concedes, it is the law of this case that MMWEC was the sole “purchaser” under the PPA when it demanded that MASSPOWER seek to must-run its plant. See Plaintiffs Post-Trial Proposed Findings of Fact and Conclusions of Law (MASSPOWER’S Post-Trial Submission) at 299.
The Appeals Court also agreed with the motion judge’s second ruling, i.e., that “Masspower’s failure to [cooperate in having the facility declared must-run] constituted a material breach of a material obligation . . .” Appeals Court decision, at 13 (see discussion below).
The Appeals Court rejected the motion judge’s third ruling that such breach “satisfied the ‘materially and adversely [effects’ prong of the PPA’s termination provision, without further proof of harm.” Id. The court concluded that “whether MMWEC was materially and adversely effected, in the context of this industry and these parties, is a question of fact that requires remand to the Superior Court for trial.” Id. at 22.
MMWEC argues that the Appeals Court thus resolved the issue of whether, by refusing to cooperate in MMWEC’s must-run demand, MASSPOWER materially breached the PPA. See MMWEC’s Pre-Trial Legal Mem., at 7. MASSPOWER argues that whether it materially breached the PPA remains a live issue. MASSPOWER contends that MMWEC’s assertion “that the Appeals Court held that MASSPOWER’S breach was ‘material,’ not only is . . . inconsistent with the Appeals Court’s general vacatur of Judge Gants’ decision, but the court also specifically held that ‘whether MMWEC was materially and adversely effected, in the context of this industry and these parties, is a question of fact that requires remand to the Superior Court for trial. Appeals Court Decision, at 22.’ ” MASSPOWER’S Post-Trial Submission, at 298-99 (emphasis in original).
*54 MASSPOWER’S argument misreads both §7.1 of the PPA and the Appeals Court’s interpretation thereof, and in particular the references in both to the term “material.”[6] Section 7.1 uses “material” in two separate contexts: first, to modify “fail[ure]” and “default;”[7] and second, to modify the effect of any such failure or default on MMWEC.[8] MASSPOWER conflates those two different uses of “material” when it argues that the existence of fact issues as to whether the breach “materially . . . affected” MMWEC, as the Appeals Court determined, means also that a fact issue exists as to whether the failure or default was material. The latter determination—i.e., whether MASSPOWER failed or defaulted on an obligation in a manner that was significant, rather than trivial—can be determined without reference to the effect of that failure or default on MMWEC. Indeed, the Appeals Court points out that the two clauses of §7.1 must both be given meaning: “An interpretation that gives a reasonable meaning to all of the provisions of a contract is to be preferred to one which leaves a part useless or inexplicable.” Appeals Court decision, at 18 (citations omitted).
The Appeals Court accordingly adopts the motion judge’s determination that no issue of fact exists as to whether MASSPOWER’s breach was material, and rejects his determination that no issue of fact exists as to whether the effect of the breach on MMWEC was material (and adverse):
A material breach of a contract by one parly generally excuses the other party from further performance. Nevertheless, parties to a contract may agree to further restrictions on the right to terminate their contract, which we will enforce. Accordingly, section 7.1 of the PPA is enforceable as written, and MMWEC was required to show that the breach of the must-run provision had both a material and an adverse effect on MMWEC in order for it to terminate the agreement.
[[Image here]]
We conclude that the PPA permitted termination only upon a showing that Masspower’s breach effected MMWEC in a manner that was not only material, but also detrimental, unfavorable, or contrary to its interests. Without proof of both a material and an adverse effect on MMWEC, caused by Masspower’s refusal to seek must-run of the facility, termination of the contract is not an available remedy for breach of the must-run provision.
Id. at 17-19 (citations omitted) (emphasis added).
With regard to the breach of contract claim, therefore, the Appeals Court has resolved in MMWEC’s favor the question whether MASSPOWER “fail[ed] in any material respect to comply with” its obligation under the PPA to “cooperate with [MMWEC’s request to] seek to have the Facility declared ‘must-run’ by NEPOOL.” PPA, §§7.1, 4.3. MASSPOWER’S breach of con tract claim thus restsupon whether its own breach had a “material and adverse” effect on MMWEC. If so, MMWEC had the right to terminate the PPA, and therefore did not breach it; if not, then MASSPOWER has established liability on its contract claim.
Following the Appeals Court decision, MASSPOWER moved, with MMWEC’s assent, to amend its complaint in this action to add an abuse of process claim. The Court allowed the motion on September 8, 2009. On December 14, 2009, the Court decided the parties’ respective dispositive motions. See Memorandum of Decision and Order on Dispositive Motions (Fabricant, J.) (December 2009 Order). The Court stated that, with regard to MASSPOWER’S contract claim, the Appeals Court had determined that a genuine dispute of material fact existed “on the question of whether Masspower’s refusal to cooperate in seeking to operate the facility as a must-run had an effect that was [adverse, i.e.,] detrimental, unfavorable, or contrary to MMWEC’s interests.” Id. at 1, quoting Appeals Court decision, at 22. The Court then notes: “The [Appeals] Court then remanded the case for trial on that issue (as well as other identified issues to be discussed infra).” December 2009 Order, at 1 (emphasis supplied).
The remaining issues which the Court in that Order identifies for trial are: (1) whether MMWEC “exercised [its right to demand must-run] for the purpose of extracting a benefit to which it was not entitled—that is, buy-out of the contract at a discounted price” (citing Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 472-73 (1991)), id. at 2-3; (2) whether “evidence that both sides continued to contemplate buy-out, and to communicate about the possibility, such that MMWEC would have had a continuing interest in negotiating leverage],] . . . combined with the statements made by some of MMWEC’s participants, could support a finding of ulterior purpose,” id. at 3-4; and (3) damages from any abuse of process.[9]
The December 2009 Order notwithstanding, MASSPOWER contends in its Pre-Trial Memorandum of Law (MASSPOWER’S Pre-Trial Memorandum), submitted February 22, 2010, that “any breach by MASSPOWER was not ‘material,’ ” id. at 6. As discussed above, that issue was resolved against MASSPOWER before trial.
MASSPOWER’S Pre-Trial Memorandum also posits an additional issue for trial. It contends that PPA §7.1 “precludes termination for breaches that are ‘due to causes . . . attributable to [MMWEC’s] wrongful act or failure to act,” and that “MMWEC’s failure to ‘cooperate’ with MASSPOWER under the must-run clause is such a ‘failure to act’ or a ‘wrongful act’ and, therefore, precluded termination." MASSPOWER’S Pre-Trial Memorandum, at 5. MASSPOWER points to §4.3 of the PPA, which it says “requires ‘cooperation]’ *55 in the event that MMWEC (and any other Purchasers) ‘decide to seek to have the Facility declared ”must-run" by NEPOOL.’ “ Id,
Section 4.3 provides that “Seller [MASSPOWER] agrees to cooperate with Buyer [MMWEC] and the other Purchasers if they decide to seek to have the Facility declared ‘must-run’ by NEPOOL.” Not only does §4.3 expressly place the obligation to “cooperate” on MASSPOWER, but the scope and objective of such cooperation is narrow, i.e., to “have the Facility declared ‘must-run’ by NEPOOL.” Nowhere in §4.3 is any obligation placed on MMWEC to cooperate with MASSPOWER in agreeing to an alternative to must-run, i.e., in MASSPOWER’s words, to “discuss! ] an admittedly feasible offer to provide the equivalent of must-run from other plants that would not go bankrupt.” MASSPOWER’s Pre-Trial Memorandum at 5. Yet MASSPOWER argues that MMWEC’s “secret[ ] decision] not to pursue the offer and, despite its admitted ability to do so, declin[ing] to meet until after it had terminated the contract,” id., amounted to “bad faith and failure to cooperate constitut[ing] a ‘failure to act’ or a ‘wrongful act’ that either excused any breach at common law or, at a minimum, under the express terms of PPA §7.1, preclud[ing] MMWEC from terminating.” Id. at 6. Section 4.3 simply does not support MASSPOWER’s argument.
From the foregoing, the Court concludes that, as to each of the four counts of the First Amended Complaint, the following were live (and largely overlapping) issues at trial, and remain to be determined by the Court:
I. Breach of Contract Because, as a matter of law, §4.3 does not obligate MMWEC to “cooperate” with MASSPOWER in seeking an alternative (equivalent or otherwise) to must-run, the Court rejects MASSPOWER’s contention that the issue was to be determined at trial. Moreover, MASSPOWER’s material breach of §4.3 is established. Accordingly, the only issues to be determined after trial on MASSPOWER’s contract claim are (1) whether MASSPOWER’s breach of §4.3 “materially and adversely” affected MMWEC; and, if not, (2) MASSPOWER’s damages.
II. Breach of Implied Covenant. The issues to be determined are (1) whether MMWEC exercised its right to demand must-run unfairly or in bad faith, and abused the legal process by filing the MMWEC Action, for the purpose of extracting a benefit to which it was not entitled—that is, a buy-out of the contract at a discounted price; and if so, (2) MASSPOWER’s damages.
III. Violation of c. 93A. The issues to be determined are (1) whether MMWEC unfairly or deceptively exercised its right to demand must-run for the purpose of extracting a benefit to which it was not entitled—that is, a buy-out of the contract at a discounted price; (2) whether MMWEC unfairly or deceptively exercised its right to demand must-run, and filed the MMWEC Action, for the purpose of disrupting the sale of MASSPOWER and thereby gaining leverage in its buyout negotiations with MASSPOWER; and, if so, (3) MASSPOWER’s damages.
IV.Abuse of Process. The issues to be determined are (1) whether MMWEC filed the MMWEC Action for the purpose of disrupting the sale of MASSPOWER and thereby gaining leverage in its buy-out negotiations with MASSPOWER; and, if so, (2) MASSPOWER’s damages.
FINDINGS OF FACT
The parties have, in response to the Court’s request, submitted their “Compilation of Undisputed Facts Within the Parties’ Post-Trial Proposed Findings of Fact” (Undisputed Facts) which sets forth the proposed facts of each parly which the other does not dispute.[10] On the basis of those undisputed facts, the facts established in prior proceedings as set forth above, and the credible evidence at trial and inferences reasonably drawn therefrom, the Court finds as follows.
I. Background
MASSPOWER is a general partnership organized under the laws of Massachusetts. MASSPOWER’s principal physical asset is an electric generating unit located in Springfield, Massachusetts (facility, or plant). The original partners of MASSPOWER were J. Makowski, Bay State Gas, Tenneco Gas Pipeline, General Electric, and U.S. Generating Co., which was a partnership of Pacific Gas & Electric and Bechtel. In addition to their equity interests, the original partners all had additional roles: J. Makowski developed the MASSPOWER project; Bay State laid a 23-mile gas pipeline to the plant; Tenneco owned gas pipelines serving the plant; General Electric provided equipment and operations and maintenance personnel; and Bechtel built the plant.
At the time that the PPA was signed, the partners of MASSPOWER were MASSPOWER, Inc.; Springfield Generating Company, LP; MP Cogen, Inc.; Bay State Energy Development, Inc.; and Tenneco Independent Power I Company. These entities were subsidiaries of the original partners.
The current owners and general partners of MASSPOWER are BG MP Partners I, LLC and BG MP Partners II, LLC, both of which are limited liability companies organized under the laws of Delaware. Following a sale transaction on May 1, 2007, each is an indirect wholly-owned subsidiary of BG North America, LLC, an affiliate of BG Group pic, a publicly traded international energy company headquartered in the United Kingdom.
BG MP Partners I, LLC, and BG MP Partners II, LLC, are the same entities that were formerly known as Silver Ship MP Partners, LLC, and Silver Ship MP *56 Partners II, LLC; those entities merely changed their names to the names by which they are currently known, after a transfer of ownership of their parent entities. The Silver Ship entities (now known by the BG names), became the general partners of MASSPOWER on December 28, 2005, by collectively purchasing all interests of the previous partners (known as the “Houston” partners). Both the original partnership agreement, at article 12, and the Massachusetts Uniform Partnership Act, G.L.c. 108A, §27, authorize transfers of partnership interests. That transfer of ownership of the partnership interest had no effect on partnership property, which remained in the partnership. See G.L.c. 108, §8. Accordingly, the Court has rejected MMWEC’s theory that MASSPOWER can prove no injury resulting from its suit because its present owners are not the ones who were harmed. December 2009 Order, at 3-4.
The undisputed facts establish that the named plaintiffs are the proper parties to assert the claims herein. December 2009 Order, at 5.
MASSPOWER owns a “combined cycle” plant that utilizes GE Frame 7 turbine technology. Combined cycle operation is a fuel-efficient way of creating electricity in which gas-fired turbines produce electricity, and the heat generated during this process is used to boil water, which generates steam that runs through a steam turbine to produce additional electricity. MASSPOWER also sells the steam generated through this process to a chemical manufacturer.
The plant operates primarily on natural gas but has a permit to bum oil for 35 days per year. The plant has only limited oil storage.
The generating capacity of the entire plant is 238 megawatts in the summer period and 276 megawatts in the winter period.
Defendant Massachusetts Municipal Wholesale Electric Company (“MMWEC”) was created by statute, St. 1975, c. 775, and is a public corporation of the Commonwealth of Massachusetts. MMWEC’s purpose is to plan, acquire, and establish independent electric power supply on behalf of municipal light departments and other electric utilities. MMWEC acts as a wholesaler of electric energy and either purchases energy in bulk or participates in the ownership of all or part of electric generating facilities.
MMWEC resells electricity to its members and to other municipals in Massachusetts and other states.
MMWEC is a joint action agency created by the Legislature to plan, finance, and acquire power supply resources on behalf of Massachusetts cities and towns that have their own light departments. St. 1975, c. 775.
Among other things, MMWEC purchases electricity at wholesale and resells it to its members, which are all Massachusetts municipal light departments. Massachusetts Municipal Wholesale Electric Company v. Town of Danvers, 411 Mass. 39, 41 (1991).
Essentially, MMWEC is a vehicle through which its members, which typically are small, can pool their resources to obtain the economic benefits of purchasing electricity in bulk. Id. MASSPOWER and MMWEC are both engaged in trade or commerce in Massachusetts with respect to the power purchase agreement between them.
II. Formation of the PPA
On April 10, 1990, MMWEC and MASSPOWER entered into an Agreement for the Sale of Net Capability and Corresponding Energy By and Between MASSPOWER and Massachusetts Municipal Wholesale Electric Company (“the PPA”). The PPA was amended on April 30, 1991.
The PPA was a contract between sophisticated and well-represented parties.
By its terms, the PPA was an integrated agreement. Section 9.12 states:
This Agreement constitutes the entire Agreement between the Parties relating to the subject matter hereof, and all previous agreements, discussions, communications, and correspondence with respect to the subject matter hereof are superseded by the execution of this Agreement.
Under the PPA, MMWEC agreed to purchase 7.86% of the generating capacity and electric energy of the MASSPOWER plant for a term of twenty years starting on the defined “Commercial Date.” The “Commercial Date” occurred on August 1, 1993. The PPA, absent early termination, was therefore not due to expire until August 1, 2013.
Since the summer rating of the plant was 238 megawatts and the winter rating was 278 megawatts, MMWEC’s purchase of 7.86% of the plant’s generating capacity averaged approximately 20 megawatts.
Pursuant to separate agreements that essentially passed through MASSPOWER’s charges under the PPA, along with MMWEC’s administrative expenses, MMWEC resold the electric capacity and energy purchased from MASSPOWER to municipal light departments serving the Towns of Littleton, Wakefield, Groton, Ipswich, and Ashburnham, and the City of Holyoke. These agreements were executed on April 1, 1989, more than a year before the execution of the PPA on April 10, 1990.
Holyoke purchased 43.2% of MMWEC’s entitlement; Littleton, 17.0%; Wakefield, 15.4%; Ipswich, 13.7%; Groton, 7.4%; and Ashburnham, 3.4%.
Under the contracts with these municipal light departments, referred to as “participants,” MMWEC agreed to sell to the participants the net capability and electricity purchased from MASSPOWER under the PPA.
*57 By law, municipal light departments have an obligation to serve the residents and businesses in the city or town in which they operate.
Each light department is subject to the direction and control of a municipal light board, the members of which are elected by the city or town residents that the light department serves. G.L.c. 164, §§55, 56.
The PPA was signed before the plant was built, and MMWEC understood that one of its purposes was to help secure project financing.
The PPA imposed upon MMWEC the obligation to pay two types of charges: fixed and variable.
The fixed charges, which were payable regardless of whether the Facility was actually operating and generating electricity, included a capacity charge designed to help MASSPOWER recover the facility’s capital costs.
MMWEC was required to pay the capacity charge as long as MASSPOWER was available for dispatch even if MASSPOWER was not selected for dispatch.
The capacity charge provision obligated MMWEC to make a minimum monthly capacity payment as long as the plant was available to run at least 85% of the time during the preceding one-year period. This payment had to be made regardless of whether the plant actually ran or not.
The plant has a historical availability of approximately 95%.
In contrast to the fixed charges, the variable charges changed according to Facility operation, and included a fuel charge that correlated to MMWEC’s 7.86% share of the fuel costs actually incurred by MASSPOWER to operate the facility and generate electricity.
Like any long-term contract requiring the payment of fixed charges, the PPA presented the risk that at any point in time, the amount to be paid by MMWEC might be well above or well below the market value of the electricity and capacity to be sold by MASSPOWER. In other words, the PPA presented the risk that at any given time, either MMWEC or MASSPOWER might be “out of the market.”
The PPA also provided for a “bonus" to MASSPOWER for increased operation in the form of an increase in the Capacity Charge Adjustment Factor, or “CCAF,” if the plant’s “Monthly Actual Dispatch Hours” were 85% or more of the total number of hours in a month. In that event, the CCAF has increased from 1 to as much as 1.353, which number is multiplied by the base capacity charge to determine the total capacity charge billed to MMWEC.
The calculation of “actual dispatch hours” is different from the calculation of “capacity factor.” Any hour when the plant is dispatched to run constitutes an actual dispatch hour. The capacity factor, by contrast, is the amount of generation actually produced by a generator over some period of time as a fraction of the total amount of energy that could have been produced from the unit based on its maximum available capacity. Thus, running all 744 hours in a month at 50% operation level would yield a capacity factor of 50%, and amonthly actual dispatch of 100%.
The system operator could elect not to dispatch MASSPOWER, even if MASSPOWER requested to must-run, or “self schedule,” the plant. The system operator’s primary concern was safety and reliability, which could overrule other dispatch considerations.
Under §6.5 of the PPA, MMWEC was to pay a pro rata share of MASSPOWER’s commodiiy cost of fuel, which correlates to the actual generation of electriciiy. This charge for the cost of the gas itself was a variable cost. MMWEC also paid its pro rata share of the cost of transporting fuel to the plant.
At the time that the PPA was being negotiated, MASSPOWER was expected to, and it later did, make long-term contracts to transport fuel from Canada and Everett, Massachusetts that it would be purchasing from suppliers ProGas and Distrigas, respectively. These transportation contracts had fixed “reservation" charges for reserving space on the pipeline. The charges had to be paid regardless of whether the plant ran and burned gas.
The fuel supply contracts, which were ultimately executed in August of 1991, did not provide for fixed prices; rather, the fuel prices under the contracts varied monthly with certain market indices. Periodically, if MASSPOWER and its suppliers could not agree on new pricing terms, the contracts required arbitration of those terms, returning the prices to the market price.
In addition to executing the PPA with MMWEC, MASSPOWER executed power purchase agreements with three investor-owned utilities (IOUs), Western Massachusetts Electric Company (WMECO), Boston Edison Company (BECo), and Commonwealth Electric Company (Com/Elec).
BECo and Com/Elec later became part of NSTAR.
WMECO and NSTAR are subject to the supervision and control of the Department of Public Utilities (DPU), a state agency charged with protecting consumer interests. G.L.c. 164, §§76-102.
III. NEPOOL
NEPOOL has had at all relevant times a system operator whose function includes balancing electric generation with fluctuating electric demand, or load, in the region.
At the time the parties executed the PPA in 1990, the NEPOOL system operator was the New England Power Exchange (NEPEX). ISO-New England, Inc. (ISO-NE) replaced NEPEX in 1997.
*58 Within NEPOOL, member utilities are financially debited for the electricity consumed by their respective loads (for example, by residents and businesses in Littleton), and are credited for the electricity that they provide, either from generating units they own themselves or have under contract.
At all relevant times, the six participating municipals were members of the Pool.
At the time the parties formed the PPA, and throughout the period before MMWEC terminated the PPA, MASSPOWER was not a member of the Pool. Payments between MASSPOWER and MMWEC were separate from the Pool settlement system. It was only in the late summer of 2007, after MMWEC terminated the PPA, that MASSPOWER became a member of the Pool.
Whenever the MASSPOWER facility was available and ordered to run by NEPEX (later, ISO-NE), the six participating municipals received credit for 7.86% of the MASSPOWER energy delivered to NEPEX/ISO-NE in an hour.
The Pool separately credits its members for the capacity of the plants that a utility owns or has under contract when they are available to generate even if they do not run.
MMWEC’s PPA with MASSPOWER thus helped the six participating municipals meet their capacity obligations to the Pool.
PPA §4.3 specifies that “the Facility will be available for dispatch by NEPEX in accordance with the NEPOOL Agreement and that the Facility will be deemed a dispatchable unit for purposes of economic dispatch by NEPEX ...” A “dispatchable” facility was one that operated only when NEPEX determined that it should do so.
This meant that, subject to the grid operator’s control for system safety and reliability, the plant was to run when selected by the grid operator based on its comparative incremental expense of generation in relation to other plants, as calculated in accordance with NEPOOL rules.
The grid operator, which was NEPEX at the time the parties entered the PPA, would decide when the MASSPOWER plant would be turned on and at what level of output it would operate.
The general aim of those rules was to select plants with the lowest cost of production first.
Generally speaking, therefore, the facilities with the lowest incremental cost were selected for operation or “dispatched” before facilities with higher incremental costs. Appeals Court Decision, at 6. Through this system of “economic dispatch,” NEPEX was able to achieve reliable electricity supply for the region for the least cost.
The cost of producing electricity is the product of two variable factors: (a) the cost of fuel to run the facility, and (b) the facility’s efficiency in converting that fuel to electricity. The efficiency of a generating facility in converting fuel to electricity is referred to as its heat rate. Heat rate is the number of British Thermal Units (BTUs) needed to generate one kilowatt-hour of electricity.
Fuel cost was the primary factor in determining incremental cost. The lower the dispatchable facility’s fuel costs, the lower the facility’s incremental cost, and other things being equal, the more it was dispatched by NEPEX.
Other factors considered by NEPEX in determining whether to dispatch a facility included the operating characteristics of the facility—the start-up time, the minimum run time, and any minimum downtime.
In contrast to a dispatchable facility, a must-run facility was one that operated when the facility owner or operator determined to “self-schedule” the facility to run independent of its incremental cost. A must-run facility typically operated virtually continually, except when system safety, reliability, or maintenance required the facility to cease operation.
A must-run facility sometimes operated when it was not economic to do so, i.e., in circumstances where the incremental costs of generating electricity exceeded the price at which the electricity generated could be sold in the market.
In addition, there is an industry-wide characterization of facilities that is based on the frequency with which the facilities operate. “Baseload” facilities typically operate from 70-100% of the time. They usually have high fixed costs and low variable costs. When the fixed costs are spread over many hours of operation, the total cost per megawatt hour (MWh) is relatively low. “Intermediate” facilities operate from roughly 20-30% of the time up to 60-70% of the time. They have moderate fixed and variable costs. They are the most economic way to supply the energy that occurs during weekday on-peak or business hours. “Peaking” facilities operate from 0% to 20-30% of the time. They have low fixed costs and high variable costs.
In the late 1990s NEPOOL was restructured.
In 1997, ISO New England, Inc. (ISO-NE) succeeded NEPEX as the central system operator. In May 1999, ISO-NE changed the procedure for the dispatch of dispatchable facilities, discarding the old NEPOOL regulations for calculating dispatch rank order under “economic dispatch.” Instead of selecting the facilities to be dispatched based on the facilities’ incremental costs, ISO-NE began selecting the facilities to be dispatched based on an auction-style system of bids submitted by the facilities’ operators.
Generally stated, under this system, ISO-NE ranks the bids it receives from lowest to highest until enough generation is bid to meet the New England demand for *59 electricity in any given hour. The highest bid necessary to meet demand establishes the “clearing price,” also sometimes referred to as the “locational marginal price” or “LMP."
If a facility bid is below the clearing price, ISO-NE selects that facility for dispatch. If a facility bid exceeds the clearing price, ISO-NE does not select that facility for dispatch.
The facilities that clear, Le., are chosen for dispatch, are paid the clearing price for each megawatt hour they generate.
ISO-NE administers two markets for electricity: the day ahead market and the real time market.
For the day ahead market, each generator in New England submits bids by noon each day reflecting the prices at which it is willing to operate for each hour of the next day beginning at noon.
The generators that clear in the day ahead market are scheduled to operate the next day and receive the day ahead hourly clearing prices for the MWhs they generate.
If a generator is not selected to run in the day ahead market, ISO-NE can call upon it to run the next day in the real time market. ISO-NE dispatches generators in real time based on their bids to balance the available supply of electricity with the demand for electricity.
The generators that run in the real time market are paid the real time clearing price, i.e., the price bid by the last facility, dispatched in real time during the hour.
The primary difference between economic dispatch by NEPEX in 1990 and economic dispatch by ISO-NE today is that, in 1990, economic dispatch was a cost-based process, whereas today, it is a market-based process.
Self scheduling, or must-running a facility, means that for some period of time, the facility must be on-line operating, and cannot be shut down absent reliability or safety problems, or required maintenance.
The owner does not need to schedule, i.e., must-run, the facility to operate every hour of the year, but can designate an hour-to-hour schedule.
IV. MASSPOWER’s Participation in the New ISO-NE Auction Market
The PPA vests operational responsibility for the plant with MASSPOWER, and does not dictate the content of bids. MASSPOWER itself has always prepared the calculation of the bids.
After the new market came into effect, and with the support of MMWEC and the other purchasers, MASSPOWER submitted bids on a weighted average of the economic interests (opportunity costs) of MASSPOWER and its contract purchasers. This meant that a portion of the bid was based on the variable charges under the BECo contract (which was based on indices, not actual fuel costs); the WMECO and Com/Elec purchase agreements (for which the same was true); the PPA; and, with respect to the unsubscribed portions, MASSPOWER’s opportunity to resell any gas that had been purchased under its fuel supply contract.
MMWEC knew of this method and did not object.
MMWEC benefitted from MASSPOWER’s use of its fuel resale opportunities in calculating its bid because any resale proceeds were shared with MMWEC pro rata.
MASSPOWER’s bids needed to account for the risk inherent in the nature and structure of the gas and electricity markets.
Because generators are required daily to submit a day-ahead bid unto the Pool, if a generator anticipates that ISO-NE will select its plant to run in the day-ahead electricity market, the generator will buy gas in the day-ahead gas market at 10 a.m., and derive and submit its bid to ISO-NE by noon. However, the generator will not learn whether it has actually been selected by ISO-NE in the day-ahead electricity market until 4 p.m.
MASSPOWER therefore faced the risk that if it bought day-ahead gas and ISO-NE did not select it to run, it would need to resell, or “lay off," the gas it had purchased in the day-ahead gas market at a loss in the intra-day market.
In addition, because MASSPOWER needed to reserve space on the gas pipelines to transport the day-ahead gas to its facility, MASSPOWER could incur pipeline penalties for gas that it could not use; the penalties were often larger than the cost of the gas itself. MMWEC would bear its pro rata portion of any such penalty.
If MASSPOWER anticipates that ISO-NE will not select MASSPOWER’s plant in the day-ahead electricity market, it does not purchase gas in the day-ahead gas market, and instead formulates its day-ahead bid into the Pool based on its prediction of the price for gas in the intra-day gas market, which generally tends to be a higher price than the published day-ahead gas price. If the plant were then chosen to run, MASSPOWER would need to purchase gas in the volatile intra-day gas market. If MASSPOWER has to pay an actual intra-day gas price that exceeds its anticipated cost, MASSPOWER might run at a loss for that day, to be shared pro rata by MMWEC. MASSPOWER and MMWEC faced the same risk if MASSPOWER had not purchased day-ahead gas, and was selected to run in the real-time electricity market.
Thus, MASSPOWER and MMWEC were subject to shared losses on those occasions when MASSPOWER wrongly predicted the intra-day gas prices.
*60 Nevertheless, when energy prices were high relative to the cost of fuel, MASSPOWER’s plant was selected to run based on its bid, and MMWEC profited from the difference between the value of energy and the cost of fuel.
During periods when it had long-term gas supply contracts but was not running, MASSPOWER would resell the natural gas that it had purchased under contract but had not burned, and credit MMWEC with a pro rata share of the proceeds. MMWEC was aware of this practice and did not object.
If MASSPOWER was selected to run after it had resold the natural gas purchased under a firm contract, it would purchase spot gas from the market. MMWEC was also aware of this practice, and did not object.
MASSPOWER’s participation in the ISO-NE auction market became problematical as the restructuring of NEPOOL resulted in a building boom of new construction of more efficient power plants. The new plants had a lower heat rate, that is, they required less natural gas to generate the same amount of electricity.
Accordingly, the new plants could submit relatively lower bids, the result of which was that MASSPOWER was not selected to run as frequently.
When MASSPOWER was not selected, MMWEC avoided the variable fuel costs it was required to pay under the PPA, and avoided paying the capacity bonus.
On the other hand, the building boom lowered the market price of capacity, making the PPA’s capacity payments more expensive than replacement capacity that MMWEC would have been able to purchase from the market. Because of that, and the fact that it was paying a relatively high capacity charge to MASSPOWER at the same time as MASSPOWER was being selected less and less frequently by ISO-NE, MMWEC concluded that the PPA had become economically disadvantageous.
Accordingly, the prospect of a buyout of the PPA became attractive to MMWEC.
V. Deregulation of the Electric Utility Industry
In 1997, the Legislature restructured and deregulated the Massachusetts electric industry to allow consumers the option of purchasing their electricity from suppliers other than their local utility (known as “retail choice”).
Prior to enactment of the restructuring legislation, IOUs like WMECO and NSTAR had an obligation to serve customers within their franchise areas, and would either generate electricity or purchase it to supply to their customers. The legislation changed that by separating the generation of electricity from its delivery. Now, IOU’s function primarily to distribute to their customers electricity generated by other entities, and to provide service to theircustomers.
To facilitate its restructuring of the role of IOUs, the legislation gave IOUs strong incentives to sell their generating facilities. It also gave IOUs incentives to buy out or terminate above-market power purchase agreements.
In particular, the legislation authorized IOUs to recover the above-market costs of any such contracts from their retail customers, thereby shifting the costs and risks associated with above-market contracts from the IOUs’ shareholders to the IOUs’ retail customers.
Significantly, the legislation allowed the IOUs to finance the buyout of above market power purchase contracts through “securitization.” The legislation authorized two state agencies, the Massachusetts Industrial Finance Agency and the Massachusetts Health and Education Finance Authority, to issue tax-exempt “rate reduction” bonds to finance the buy-out of the IOUs’ power purchase agreements, and to secure repayment of the bonds by an irrevocable charge levied on the IOUs’ customers.
The restructuring legislation did not apply to MMWEC or the light department participants.
Consequently, the restructuring legislation provided no direct incentives to MMWEC or the participants to terminate above market power purchase agreements. The participants continued to have long-term service obligations to their customers, and, therefore, needed long-term resources, including power purchase agreements, to meet those service obligations.
VI. MASSPOWER’s Other Purchasers Buy Out Their PPAs
As noted above, after executing the PPA in 1990, MASSPOWER signed long-term power purchase agreements with BECo, Com/Elec, and WMECO for all but about five percent of the remaining output of the facility.
MASSPOWER’s agreements with BECo, Com/Elec, and WMECO differed from the PPA in price terms. Whereas MMWEC paid a flat 7.86% of MASSPOWER’s fuel costs, the other purchasers paid prices set by contract and not tied to MASSPOWER’s actual fuel costs.
Accordingly, with respect to bidding or pricing the plant for dispatch and procuring fuel, MASSPOWER’s economic interests were most aligned with MMWEC’s, and the two parties in that respect stood “shoulder to shoulder.”
MASSPOWER took advantage of the incentives in the restructuring legislation by negotiating buyouts of its power purchase agreements with WMECO and NSTAR.
*61 The buyout of the WMECO agreement was consummated on May 17, 2001. MASSPOWER received approximately $80 million.
On June 8, 2004, MASSPOWER signed an agreement with NSTAR pursuant to which NSTAR agreed to pay MASSPOWER $377 million to buy out its power purchase agreement. The NSTAR buyout was completed on March 1, 2005.
VII.The Must-Run Clause
At the time the PPA was negotiated, the NEPOOL rules permitted plants to opt out of the “economic dispatch” rules and undertake must-run, that is, to operate irrespective of selection under those rules (unless otherwise proscribed by technical concerns) .
Under the NEPOOL rules, a plant could be must-run whenever it was available or, alternately, for limited periods (even just a few hours) or months on end. In addition, a plant could be must-run for only a portion of its capacity rather than full output.
During negotiations for the PPA, MMWEC had concerns regarding the fixed charges, which it deemed high. MMWEC worried that it might end up paying the high fixed charges even though the facility was not being frequently selected for dispatch.
MMWEC therefore asked MASSPOWER to guarantee that the facility would be dispatched frequently as a baseload facility.
MASSPOWER refused MMWEC’s request for a guarantee of plant dispatch because, over the twenty-year term of the PPA, dispatch would depend on many variables not under MASSPOWER’s control. MASSPOWER emphasized that while it was willing to take availability risk for the entire capacity charges, it could not guarantee dispatch, which it could not control. All parties agreed that MASSPOWER’s pricing should result in baseload dispatch. They also acknowledged that baseload dispatch for the entire twenty-year term rested on many variables.
As a compromise, the parties negotiated the must-run clause, §4.3, which provides:
Dispatch: The Parties agree that the Facility will be available for dispatch by NEPEX in accordance with the NEPOOL Agreement and that the Facility will be deemed a dispatchable unit for purposes of economic dispatch by NEPEX ... In the event that the Facility is dispatched at a capacity factor of less than sixty percent over a two year period, Seller agrees to cooperate with Buyer and the other Purchasers if they decide to seek to have the Facility declared “must-run” by NEPOOL.
VIII.The Default/Termination Clause
As discussed in detail above, Section 7.1 of the PPA provides for termination by MMWEC in the event of specified defaults by MASSPOWER. That section states:
Default/Termination: If (i) Seller shall fail in any material respect to comply with, observe, perform or shall default in any material respects upon any obligation under this Agreement, except due to causes excused by force majeure or attributable to Buyer’s wrongful act or failure to act, and such failure materially and adversely affects Buyer and (ii) after written notice thereof to Seller . . . such failure [is not cured or sought to be cured within 45 days], then Buyer may, by notice in writing, terminate this Agreement as of the date of such notice
[[Image here]]
IX.Negotiations for Buyout of the PPA Through 2005 A. Negotiations Prior to 2004
As early as 1996, when the Electric Superintendent of Holyoke Gas & Electric Department, Brian Beauregard, became involved in the PPA, he was concerned about the PPA’s escalating costs.
In 1999, the parties briefly discussed a possible buyout, but made no progress because they were too far apart. MMWEC remained interested in a buyout, however, as MASSPOWER negotiated and ultimately consummated buyouts from its other purchasers.
MMWEC and its participants met in April of 2002 to explore whether there were any steps short of a buyout which could address MMWEC’s escalating costs under the PPA. At that meeting Beauregard broached the question whether MMWEC could “break,” or terminate, the PPA. He was advised by Roger Bacon, MMWEC’s Director of Power Supply, that there was no way that MMWEC could terminate the contract without cause, and that he found nothing in the contract that would provide cause.
Thus, with no basis for terminating the contract, MMWEC remained interested in a buyout, as did MASSPOWER, but the parties remained too far apart.
Beauregard and Scott Edwards, Assistant Manager of Littleton Electric Light & Water Department, were the prime movers behind MMWEC’s efforts to buy out the PPA as part of their cost-reduction efforts. Their employers, Holyoke and Littleton respectively, would be responsible for the largest shares—43.2% and 17%, respectively—of any buyout amount paid to MASSPOWER.
Like MASSPOWER, MMWEC had entered buyout agreements of other power purchase agreements to which it was a party.
In a typical power purchase contract buyout negotiation, the parties premise the negotiations on sharing a pool or “pot” of money that is created by the differential between the parties’ respective costs of money. In a typical, voluntary contract buyout negotiation, the pot was shared 50/50 or 60/40.
*62 B. Buyout Negotiations and the Parties’ Dealings in 2004-2005
In the spring of 2004, MASSPOWER advised MMWEC’s Bacon that buyout negotiations with NSTAR for the remaining contracts were underway, and that it might be an advantageous time for MMWEC to negotiate as well.
On May 3, 2004, MASSPOWER’s General Manager, Jeffrey Bentz, and its consultant, David Nickerson, met with Bacon to discuss a possible buyout. Bentz suggested a price of approximately $52 million, and Bacon suggested $32.9 million.
Bacon’s figure was not a reflection of MMWEC’s actual view at the time of the above-market value of the PPA. Rather, Bacon had determined that the net present value of the PPA at MMWEC’s discount rate was in the range of $53 or $54 million, and he believed that the right buyout value would be between $40 and $41 million. However, to keep the conversation “realistic,” he suggested a number of $32.9 million in the hope that the parties would end up around the midpoint between that and MASSPOWER’s $53 million figure. The figures were preliminary, not firm offers or demands.
Less than a month after that meeting, MASSPOWER and NSTAR signed their agreement to buy out the BECo and Com/Elec power purchase agreements. That agreement was subject to state reg-ulatoiy review to ensure that it was in the ratepayers’ interest.
When MMWEC sought to intervene in the regulatory review, NSTAR told it that if MMWEC blocked approval, NSTAR would look to it for damages. MMWEC backed off. The Court is not persuaded, on the evidence offered by MASSPOWER, that MMWEC sought to intervene for the purpose of gaining leverage in its own buyout negotiations with MASSPOWER, and so makes no such finding.
Following the May 2004 meeting, the municipal participants demanded to, and did, direct and control the buyout negotiations with MASSPOWER. The participants could do so because they dominated MMWEC’s board of directors, and therefore controlled MMWEC.
By May 11, 2005, the MMWEC board included representatives from four of the six participants in the PPA: Ipswich’s Raymond Shockey, Ashburnham’s Stanley Herriott, Holyoke’s James Lavelle, and Littleton’s Scott Edwards. Groton’s Doris Chojnowski joined the board in 2007.
Bacon, Edwards and Beauregard constituted MMWEC’s negotiating committee for buyout discussions with MASSPOWER.
In the fall of2004, MMWEC recognized that the PPA was very valuable to MASSPOWER. The town of Little-ton had hired a consultant, Mayhew Seavey, who calculated that the PPA had an above-market value of $43 million.
On September 10, 2004, MASSPOWER wrote to MMWEC to make a formal buyout offer of $52.3 million. This offer was comparable in assumptions and ratepayer savings to the buyout agreement that MASSPOWER had negotiated with NSTAR.
MMWEC’s staff reviewed the proposal and discovered several “errors” in MASSPOWER’s assumptions underlying the $52.3 million buyout price. Adjusting those “errors,” and using MMWEC’s own market value forecast, “the buyout amount declines to 40.428 million dollars . . . Additional changes in the spreadsheets’ assumptions may further reduce the Net Buyout Amount.” Bacon September 15, 2004 memorandum to participants (Trial Ex. 31, at 827[11]).
MMWEC and MASSPOWER representatives met on September 20, 2004 to discuss MASSPOWER’s proposal and the negotiation process going forward. Prior to the meeting, the participants had determined that they wanted a buyout price in the range of $8 to $11 million.
MASSPOWER stated that its objective in providing its $52.3 million proposal to MMWEC was to “have a deal that very closely resembled what NStar negotiated.” Beauregard’s minutes, Ex. 34: 848. Among MASSPOWER’s key assumptions was that its proposal would generate “a ratepayer savings of 6% using NStar’s public discount rate of 7.8%. They stated that they assumed that [the participants’] customers would be on par with the savings realized from Nstar’s customers.” Id.
At the meeting, Beauregard stated that “the 6% discount factor could be a deal breaker even if we could agree on all the rest of the assumptions throughout the model. It is not attractive enough for our customers . . .” Id. at 851.
Beauregard also reminded MASSPOWER that “there is a 60% capacity factor that must be maintained over a rolling 2year period, otherwise [MMWEC] could strike a must run scenario.” Id. at 850. This remark drew a sharp response from Bentz, who stated that “this could be a legal strategy that MMWEC could pursue and they understand that—but . . . that [’¡would you really want to bleed just to make us bleed more.[’] ” Id.
Beauregard and Timothy Peet, MMWEC’s Senior Project Manager, “very clearly identified to MASSPOWER that other than legal which is certainly a factor for us there are very real reasons why we would want to must run this unit in the future.” They identified the following reasons: (1) the ability to have the unit clear in the day ahead market for the weekday period “would be considerably more advantageous to our group as a known factor than have the unit miss most of the day ahead scheduling *63 due to [the plant’s] large startup costs and other interest factors that would cause the unit not to run”; and (2) for six of twelve months must-running would be an “insurance premium” as a hedge against power spikes and otherwise costly peaking power. Id.
Peet testified, however, the first reason applied only to weekday peak periods, and the second was not valid because “the cost of the premium to must-run the unit [when fuel costs are above LMP (market) cost of electricity,] just to provide a hedge against a possible price spike would be too great of a cost.” Trial Transcript Vol.12, at 99.[12] Nor did Peet believe that must-running the plant at full output continuously was in MMWEC’s interest. Id. at 100. (See findings below as to both points.)
MMWEC’s broaching of the must-run option as a factor which MASSPOWER should consider was a shot across MASSPOWER’s bow, intended to increase the pressure on MASSPOWER to lower its proposed buyout price.
There was considerable dissension within MMWEC regarding the wisdom of threatening the must-run option, let alone any benefit such an option could deliver for MMWEC. Bacon’s view was that, under the market-based system in place in September 2004, “must-run is suicide. It’s nuts. You don’t do it. The only reason you must-run a generator is because you have an offsetting economic value, there’s a gas contract that you’re forced to purge, you have to get it out of your portfolio.” Tr. 5: 101.
In other words, must-run operation would lose money in a market system when the cost of fuel exceeded the marginal value of the power generated. MMWEC’s staff and consultants explained as much to participants’ representatives, including Herriott, Beauregard, and Edwards. As found below, however, the participants had additional reasons for considering a demand for must-run.
The participants were also advised that must-run would probably hurt MASSPOWER much more than the participants. Ex. 50: 949. While MMWEC was purchasing 7.86% of the plant’s output, MASSPOWER would be responsible for the other 92.14%.
MMWEC had other concerns about a buyout. Participants were wary of paying money to buy out the contract when they thought the facility might not continue to operate through the term of the PPA, i.e., until 2013.
Moreover, MMWEC doubted MASSPOWER’s assumption that the capacity factor would at times exceed 85%, and that the participants’ ratepayers would benefit from a deal modeled on the NSTAR buyout. To achieve the savings for their customers attained by NSTAR for its shareholders, the participants estimated that they needed savings to ratepayers of 25%, rather than the 6% built into the NSTAR buyout. The participants were also unhappy with MASSPOWER’s allocation to them of only 6% of the “pot” of money created by the difference between MASSPOWER’s and MMWEC’s costs of money.
MMWEC did not make any buyout offer to MASSPOWER in the months following the September 20, 2004 meeting. MMWEC was waiting for more information from MASSPOWER, and MASSPOWER was waiting for a bid from MMWEC. At the time, the participants believed that an appropriate buyout price was in the range of at most $21-23 million.
During the last quarter of 2004, Beauregard and Edwards again discussed with other MMWEC participants simply “breaking the contract” if MASSPOWER did not substantially reduce its price. Bacon, on the other hand, saw no basis on which to walk away from the PPA.
No meetings between MASSPOWER and MMWEC took place between September 2004 and March 2005.
On January 24, 2005, MASSPOWER again contacted MMWEC and proposed a meeting to discuss PPA restructuring options.
On February 24, 2005, MASSPOWER contacted Littleton. Littleton told MASSPOWER that it believed an appropriate buyout amount was less than $30 million. However, Littleton agreed to consider a replacement contract. The parties exchanged proposed replacement contracts.
On March 22, 2005, MASSPOWER and MMWEC met. MASSPOWER made a presentation comparing the alternative buyout proposals and concluded that the gap between MASSPOWER and MMWEC was quite large.
MASSPOWER requested an indication of the buyout price reduction needed to achieve a buyout agreement. MMWEC responded that agreement on a buyout would require projected customer savings of 30-50%. MMWEC had obtained similar discounts in other power purchase agreement buyouts.
After the March 22 meeting, the parties exchanged counteroffers relating to replacement contracts. MMWEC and MASSPOWER met again on March 29, 2005. MASSPOWER presented three options, each assessed by MMWEC as being about $39 million above market.
Ultimately, negotiations regarding a buyout of the PPA, or a replacement contract, were unsuccessful and ended in an impasse in March 2005.
As noted above, on June 8,2004, MASSPOWER and NSTAR had signed an agreement to buy out the BECo and Com/Elec agreements. Once the NSTAR buyout was approved and the buyout was consummated, NSTAR would no longer be the “lead participant” for MASSPOWER (i.e., the party that handled the submission of dally bids into the Pool).
MASSPOWER alleges that MMWEC (specifically, Littleton) caused “logistical problems by withholding *64 routine paperwork relating to the transfer of the ‘lead participant’ ” for MASSPOWER from NSTAR to FPL Energy Power Marketing, Inc. (FPL). MASSPOWER’s Post-Trial Submission, at 65 et seq.
After reviewing the evidence, the Court does not accept MASSPOWER’s contention. Rather, the Court finds that, despite internal discussions to the contrary, MMWEC participants reacted, in the end, in a timely manner to the requirements placed on them by MASSPOWER regarding the transfer. Notwithstanding that finding, the Court also finds that Beauregard and Edwards considered whether they could hold up the transfer to gain leverage in the buyout negotiations, but were persuaded that they had no basis for doing so.
X. Changes to the Operation of MASSPOWER’s Facility in 2005
During the period from 1993 to 2003, MASSPOWER operated the facility at about 80% of its capacity, and it was regularly selected for dispatch. In 2004, MASSPOWER began selling the gas it purchased under the favorable fuel supply contracts instead of using the gas to operate the facility. By selling the gas, MASSPOWER made more money than it would have by using it.
However, because MASSPOWER’s bids to ISO-NE were based on its opportunity costs (the price it could get by selling the gas in the spot market), rather than on the costs of natural gas under the long-term fuel agreements, the bids were so high that the facility was infrequently selected for dispatch.
As a result, MMWEC received significantly less electricity under the PPA, even though the PPA required MMWEC to continue to pay MASSPOWER $7 million annual fixed charges. On the other hand, MMWEC also benefitted from its pro rata share of the profits from MASSPOWER’s fuel resales.
Although the decline in frequency of dispatch had begun before MASSPOWER terminated its long-term gas supply and transportation contracts in 2005, the latter accelerated the drop in MASSPOWER’s frequency of dispatch because MASSPOWER now had to compete with newer, more efficient plants on the level field of the spot fuel market.
XI. MMWEC’s 2005 Action Against MASSPOWER
The Court has previously discussed, under “Prior Proceedings” above, the 2005 MMWEC Action. MASSPOWER claims that, after it informed MMWEC on May 2, 2005, that the plant and the PPA would be put up for sale in a competitive auction process, MMWEC “plotted to and did file a suit against MASSPOWER not for the purpose of obtaining the relief requested in its complaint, but instead, for the ulterior purpose of disrupting the planned sale of the MASSPOWER plant in order to get leverage in buyout negotiations.” MASSPOWER’s Post-Trial Submission, at 91.
MMWEC counters that in 2004, when MASSPOWER began to change the way it operated the plant and dispatch began to decline, MMWEC undertook a legal review of the PPA. Some MMWEC staff members and participants questioned whether the change in plant operation constituted a breach of MASSPOWER’s obligations under the PPA; in addition, some were concerned that MASSPOWER might sell the favorable long-term fuel supply contracts, and believed that MASSPOWER had no right to do so under the PPA.
In the fall of 2004, MMWEC’s general counsel prepared a litigation memorandum and then a draft complaint. The litigation memorandum is not in evidence, having been withheld as privileged.
MMWEC delayed filing the complaint while it was discussing a buyout of the PPA with MASSPOWER.
In February 2005, MMWEC sent MASSPOWER two letters protesting the decline in facility dispatch and the corresponding harm to MMWEC.
Those letters raised in Bentz’s mind “the possibility of litigation with MMWEC, especially if restructuring efforts were to fail.” Ex. 89: 1234.
The minutes of a regular board of directors meeting of MMWEC on May 11, 2005, state as follows:
Minkos [Michael Minkos, MMWEC’s General Manager] reported that the MassPower Participants were unable to reach a settlement agreement with MassPower on a buyout, even after consideration of bringing in a third party to help facilitate a potential settlement. MassPower has decided to put the plant up for sale, including the MMWEC contract. Scobbo [Nicholas Scobbo, MMWEC’s general counsel] has been asked by the MassPower Participants to look into legal obligations and any potential leverage. Scobbo said that the Participants in attendance at the MMWEC Annual Meeting decided to recommend to the Board to effectuate some legal action against MassPower based on the legal issues addressed in the October/November timeframe as covered in a Memorandum to the Board.
A motion was made by Edwards, seconded by Herriott, and it was unanimously:
(Voted 05-47): to accept the MassPower Participants request and that the MMWEC Board of Directors hereby directs General Counsel expeditiously to enter into a legal action with respect to MassPower based on the same approach and strategy as addressed previously.
Ex. 98: 1287 (emphasis in original).
MMWEC filed the 2005 Action on June 30, 2005.
*65 MASSPOWER never brought a counterclaim asserting that MMWEC’s complaint was not advanced in good faith.
After the trial, MASSPOWER never moved for attorneys fees under G.L.c. 231, §6F on the ground that MMWEC’s action was insubstantial, frivolous, or not advanced in good faith.
After reviewing the evidence, and in particular evidence cited by MASSPOWER in its Post-Trial Submission, requests for findings nos. 357-464, and by MMWEC in its requests for findings nos. 173-200, 355-415, the Court finds that MMWEC brought the 2005 Action for the following purposes: (1) to pursue colorable claims, outlined by its attorney, that MASSPOWER was not operating as a baseload facility as required by the PPA, and that MASSPOWER was not entitled under the PPA unilaterally to sell its long-term fuel contracts; and (2) to disrupt MASSPOWER’s announced plans to sell the facility, so as to put pressure on MASSPOWER to resume buyout negotiations with MMWEC, and to gain leverage in such negotiations. The Court further finds that, had the latter purpose not existed, MMWEC would not have brought its 2005 Action.
The Court need not repeat here every fact which MASSPOWER has proposed in support of the Court’s findings; the following findings are both sufficient and illustrative.
Between MASSPOWER’s May 2, 2005 advice to MMWEC that it planned to auction the plant, and the May 11, 2005 directors’ meeting, MMWEC conducted its annual meeting. At that meeting, Edwards, Beauregard and Bacon discussed Edwards’s view that filing a lawsuit might be successful in “remov[ing] the MASSPOWER contract from MMWEC’s power supplies.” Tr. 6: 5-6. In that discussion, both Edwards and Beauregard stated their opinions that “it was time to have a dialog with the other participants and general counsel, the general manager, on a litigation to disrupt the sale.” Id. at 8. Their strategy was “that the disruption would lead to a lower cost of the buyout by effectively trying to give you another bargaining chip in the dialog.” Id.
Herriott, MMWEC’s board chairman, confirmed that the participants “were looking to use the tools we had to better our position,” and that they knew that bringing the lawsuit “would kind of put a fly in the ointment,” making it harder for MASSPOWER to sell the plant. Tr. 11; 33. Herriott characterized MMWEC’s goal in bringing the lawsuit as not having to begin negotiations all over with “a whole new group of people,” i.e., new purchasers of the plant and the PPA. Id. at 31. That goal also served MMWEC’s purpose of preventing a sale and thereby preserving the leverage over MASSPOWER’s existing owners that such a strategy could ensure.
The board’s approval of litigation against MASSPOWER on May 11, 2005 was with full knowledge of the strategy which Beauregard and Edwards had raised with Bacon and other participants at the annual meeting. As the minutes quoted above state, attorney Scobbo told the board that the participants had asked him “to look into legal obligations and any potential leverage,” and had “decided to recommend to the Board to effectuate some legal action against MassPower . . .” Ex. 98: 1287. While the basis for such litigation, as stated in the minutes, is “the legal issues addressed” in counsel’s 2004 memorandum, the Court finds that the board was advised and approved of the participants’ strategy of initiating litigation to disrupt any sale, thereby gaining leverage in forcing a buyout on MMWEC’s terms.
MMWEC’s 2005 complaint sought a decree of specific performance requiring MMWEC to operate the facility “as a base load unit and to deliver energy to MMWEC regularly and without interruption.” Ex. 103: 1314. That prayer for relief, while based on the language of the PPA, §4.4, was subject to interpretation as a demand that the plant be must-run.
The MASSPOWER partnership suffered damages as a direct and foreseeable result of the MMWEC Action in the form of legal expenses, and seeks only its legal fees in connection with the MMWEC Action.
Jeffrey Bentz, MASSPOWER’s general manager, negotiated and monitored the legal expenses billed by MASSPOWER’s counsel, Foley Hoag, in the MMWEC Action. He exacted a 10% discount from that firm. The legal expenses that MASSPOWER incurred in defending itself against the MMWEC Action were reasonable, both in terms of the hours billed and the hourly rates charged.
The total amount of legal fees incurred by MASSPOWER is $2,417,880.05. Of that amount, plaintiffs paid one-third, or about $800,000, pursuant to the December 20, 2005 Purchase and Sale Agreement, §4.3 (“MMWEC Escrow”).
MMWEC contends that MASSPOWER’s new owners benefitted from MMWEC’s lawsuit, because they paid a lower price for the plant than they would have had MMWEC not sued. MASSPOWER counters that MMWEC is unable to quantify any positive effect that MMWEC’s wrongful lawsuit had upon MASSPOWER’s general partners, and accordingly that it would be speculative and improper to deduct from MASSPOWER’s damages, ie., legal fees, any amount for a reduced sale price.
MASSPOWER overstates MMWEC’s burden. MMWEC must prove not the amount by which the eventual $35 million sale price was discounted from what MASSPOWER’s purchasers would likely have paid absent the MMWEC Action, but only that any such discount exceeded the amount of MASSPOWER’s legal fees.
*66 Christopher Fleming, one of the principals of MASSPOWER’S new owners after the sale in 2005, “testified that their company offered a lower price than they would have without the lawsuit but did not quantify any amount.” MASSPOWER’S Post-Trial Submission, at 121. While such testimony “is not evidence of what the price would have been without a lawsuit,” id., it is evidence that the lawsuit caused some reduction in the sale price.
Moreover, although Fleming did not “quantify any amount” of price reduction because of the pending litigation, his testimony provides evidence of the magnitude of that reduction:
Q . . . Did the pendency of the lawsuit have any impact on the price that Silver Ship was willing to pay for the MASSPOWER assets?
A. Yes.
Q. What was that impact?
A. The impact was that we knew that the other bidders were going to steeply discount the purchase price because of the pending litigation.
Q. So your testimony is then that Silver Ship was able to pay a lower price because of the lawsuit?
A. Yes.
Fleming Dep. (Ex. K), at 146-47.
While Fleming did not quantify the amount of the discount, his testimony supports the inference that, knowing that other bidders would “steeply discount” the purchase price, plaintiffs accordingly “steeply discounted” their own bid. The Court finds that plaintiffs’ “steep discount,” resulting in a purchase price of $35 million, equaled more than the $2.4 million which MASSPOWER incurred in legal expenses, and considerably more than the $800,000 which the new owners actually paid under the December 20, 2005 Purchase and Sale Agreement.
XII. MMWEC’s Demand for Must-Run
During the first few days of April 2007, MMWEC and the municipal participants learned that a new sale of the MASSPOWER project to BG Group, parent of the current owners (BG), was pending.
MMWEC understood in April 2007 that, if MASSPOWER were to switch from the economic dispatch mode to must-run operation, that would be less economically desirable from the perspective both of MASSPOWER and of any potential purchaser. Therefore, MMWEC knew that demanding must-run might disrupt the pending sale of MASSPOWER to BG.
Kevin Wright, MMWEC’s Power Supply Division Manager, asked Michael Lynch, MMWEC’s Manager of Regulatory Services and Planning, to perform an analysis of the economic effects of potential must-run operation of the MASSPOWER facility.
Lynch prepared a preliminary study that included analyses of operations under must-run and economic dispatch during a retrospective period from July 1, 2006 to March 31, 2007. His cover memo, addressed to attorney Scobbo, copy to Wright, begins: “We have looked at Masspower’s operation vs. their operating the plant 24x7 in a must run mode.” Ex. 137:2098.
Lynch’s results for the retrospective period, assuming three different heat rates, showed that must-run compared to economic dispatch would have resulted in net losses for MMWEC assuming heat rates of 8,400 and 8,500, and a net gain for an assumed heat rate of 8,300. His results for the prospective twelve-month period (May 2007 to April 2008), showed losses from must run, compared to economic dispatch, ranging from just under $750,000, assuming the most efficient heat rate, to just over $1 million, assuming the least. His analysis also predicted losses for MASSPOWER for the year ahead, comparing must-run to economic dispatch, ranging from more than $9 million to $14 million. Ex. 137: 2099.
Lynch commented at the end of his report to Scobbo and Wright that “[i]f we assume that the plant was must run using their bid prices there would be losses ... If the numbers for Case C [i.e., the retrospective economic dispatch results] were computed on an hourly basis [i.e., as bids were actually made over that period) Case C would have greater value.” The Court infers from Lynch’s comments that using MASSPOWER’S actual bids over the retrospective period would have shown greater losses assuming heat rates of 8,400 and 8,500, and a loss, not a gain, assuming the most efficient heat rate of 8,300.
Lynch produced a final report with the following result: “The results of our analysis range from a small gain [for MMWEC] to losses approaching $1 million.” Ex. 143: 2127. The latter figure reflected Lynch’s forward-looking analysis, which showed that for the succeeding twelve months “losses were calculated [ranging] from $630,000 to $940,000 depending on the heat rate used.” Ex. 143: 2131. Lynch also reported that operating at greater than 85% capacity, which was likely under a must-run scenario, would trigger MMWEC’s obligation to pay a capacity bonus under the PPA amounting to “$50,000 to $100,000 each month . . .” Ex. 143: 2128 (emphasis in original).
The final report also looked at the effect on MASSPOWER: “ [t]o determine the impact on the entire plant of being declared a must-run facility, we used MASSPOWER’S bid prices rather than fuel-based prices and compared that to the Average Daily Day-Ahead LMP at the MASSPOWER Node #497. This resulted in a $26 million loss for the MASSPOWER facility over the study period [July 1, 2006 through March 31, 2007].” Ex. 143: 2130. That figure repre *67 sented MASSPOWER’s 92% share of the overall loss. Tr. 11: 141.
Littleton’s consultant, Seavey, reviewed Lynch’s analysis and reported to Edwards that Lynch’s analysis understated the losses to MMWEC from switching to must-run.
The participants received Lynch’s report, and understood that switching from economic dispatch to must-run would likely cause them small gains or, more likely, modest losses.
The participants also understood that Lynch’s report assumed must-run on a continuous basis, and that must-running on peak hours only might have reduced or eliminated the projected losses.
Following an “emergency” meeting of MMWEC on April 26, 2007, at which Lynch presented his report, MMWEC’s board met on May 2, 2007. At that meeting the board voted to request must-run under §4.3 of the PPA. The vote was supported by directors Edwards of Littleton, Herriott of Ashburnham, Lavelle of Holyoke, and Chojnowski of Groton.
On May 4, 2007, MMWEC’s general manager sent MASSPOWER a letter stating “Pursuant to Section 4.3 of the Agreement, [MMWEC] hereby requests that MASSPOWER seek to have the Facility . . . dispatched as a ‘must-run’, or self-scheduled unit, by [ISO-NE], effective upon receipt of this request.” Ex. 152.
The May 4, 2007 letter also states: “[m]ust-run operation, as defined the [sic] NEPOOL Agreement, has been superseded by self scheduling as defined in Market Rule 1, Section III. 1.3.2 of the ISO-NE FERC Electric Tariff No 3.” That section provides that “ ‘[s]elf-schedule’ means the action of a Market Participant in committing and/or scheduling its Resource ... to provide service in an hour, whether or not in the absence of that action the Resource would have been scheduled or dispatched by the ISO to provide the service.” Ex. 369.
The definition just quoted does not define over what period self-scheduling occurs. It is possible to self schedule a facility for certain hours or days.
The Court finds that the PPA contemplated, and MMWEC intended, that the facility “would be self-scheduled to run at all times, short of whatever times it had to come offline, either for a planned outage, a forced outage, or . . . maybe reliability purposes . . . [S]hort of any of that, it’s all the time. That was . . . our understanding when we submitted our letter of May 4th.” Beauregard Dep. Tr. (9/28/09) at 63-64. That was also MASSPOWER’s justified interpretation of the letter and of the PPA.[13]
The May 4,2007 letter concludes: “[t]ake notice that MASSPOWER’s failure or refusal to [self-schedule the facility as a must-run unit] shall constitute a default under Section 7.1 of the Agreement, for which MMWEC intends to seek any remedies to which it is entitled, including termination of the Agreement.” Ex. 152: 2163.
In a letter dated May 11, 2007, MASSPOWER’s counsel conveyed MASSPOWER’s rejection of MMWEC’s must-run demand.
As noted above, MASSPOWER materially breached §4.3 of the PPA by refusing to seek to have its facility declared must-run by ISO-NE. The Court has also addressed above MASSPOWER’s contentions regarding MMWEC’s alleged duty to “cooperate” with MASSPOWER in reaching an agreed alternative to MMWEC’s must-run demand.
By letter dated July 6, 2007, MMWEC notified MASSPOWER that, because “MASSPOWER’s failure to cause the Facility to be dispatched as a must-run unit has continued for a period of forty-five days following [MMWEC’s demand for must-run], MMWEC is hereby terminating the Agreement as provided in Section 7.1 thereof.” Ex. 163: 2270. This action followed.
XIII. Bona Fides of MMWEC’s Demand for Must-Run
MASSPOWER argues that MMWEC knew of the pending sale to BG, and knew that demanding must-run might disrupt that sale.[14] Any potential purchaser would have known, however, in the course of due diligence, that under §4.3 MMWEC was entitled to demand must-run because the facility had been dispatched at a capacity factor of less than sixty percent over a two-year period; that MMWEC had threatened to do exactly that on a prior occasion; and that MMWEC had expressed its unhappiness with the PPA in numerous ways over a course of years, including filing the MMWEC Action in 2005. In any event, MASSPOWER has failed to prove any harm to either the process or the outcome of the 2007 sale of MASSPOWER resulting from MMWEC’s must-run demand.
MASSPOWER also argues that MMWEC decided to demand must-run even though Lynch’s analysis showed that switching to must-run would yield small economic gains, at best, and likely losses for MMWEC, and even though MMWEC board members and municipal participant managers had conflicting explanations for demanding must-run.
MMWEC counters that the participants viewed the Lynch report as a worst-case, extreme scenario, and that using different assumptions showed that the price of electricity to MMWEC would be lower than MMWEC was paying when MASSPOWER did operate the facility.
The evidence shows that the board members of MMWEC, and the managers of the municipal participants, had varying degrees of understanding of the Lynch report on the effects of must-run, and, more generally, of the potential advantages and disadvantages of invoking must-run under §4.3. Nevertheless, *68 with regard to MMWEC’s May 4, 2007 demand for must-run, the Court finds (1) that MMWEC fully intended to follow through with having the facility declared must-run, so as to rid itself of a contract it viewed as requiring too much money for too little capacity and generation; (2) that MMWEC also intended that its demand for must-run provide it leverage in any negotiations concerning a buyout of the PPA; (3) that, had the second intention not existed, MMWEC would still have demanded must-run in order to achieve the first; and (4) that MMWEC did not link its demand for must-run to any demand for a discounted buyout.
XIV. Whether MASSPOWER’s Refusal to Must-Run “Materially and Adversely” Affected MMWEC
MMWEC defends its termination of the PPA by contending that MASSPOWER’s breach of its obligation under §4.3 “materially and adversely affected” MMWEC, entitling MMWEC to terminate in accordance with §7.1. Thus, argues MMWEC, its termination was not a breach of the PPA. The Court makes the following findings regarding MMWEC’s specific assertions of effects it alleges were both material and adverse (i.e., “detrimental, unfavorable, or contrary to MMWEC’s interests,” December 2009 Order, at 1, citing Appeals Court decision, at 22).
A. MMWEC Was Deprived of the Benefits of its Bargain
MMWEC asserts that it entered into the PPA for the purpose of procuring baseload electricity, and that MASSPOWER’s refusal to must-run was “detrimental and contrary to MMWEC’s interests because MMWEC was paying MASSPOWER $7 million a year in fixed charges and getting virtually no electricity.” MMWEC’s Post-Trial Proposed Finding Nos. 260, 262. Moreover, MMWEC asserts, MMWEC was adversely affected by MASSPOWER’s refusal to must-run because it “deprived MMWEC of the lower unit costs (cost/MWh) must-running would have achieved.” Id., No. 269.
As to the latter, MMWEC’s expert, Philip Hanser, calculated that the unit cost (cost per MWh) of electricity from the MASSPOWER facility was $66/MWH in 2003; as the capacity factor of the facility declined, the unit cost increased to $76/MWH in 2004, $114/MWH in 2005, and $244/MWH in 2006. Under must-run operation, the cost per MWH would have been $69/MWH in 2004, $104/MWH in 2005, and $102/MWH in 2006.
As Hanser admitted on cross examination, he included MMWEC’s fixed costs in making his calculations, even though he agreed that such costs (which are due under the PPA whether the plant operates under economic dispatch or must-run) ought not to be considered in determining the incremental costs of switching to must-run. Tr. 18: 31-32.
Accordingly, as to MMWEC’s first basis for asserting material and adverse effect, the Court finds (1) that MASSPOWER’s refusal to must-run the plant frustrated MMWEC’s purpose and expectation, in agreeing to the PPA, of procuring baseload electricity: because a baseload facility operates between 75 and 100 percent of the time, and the must-run provision in §4.3 was in part a remedy for MMWEC in the event the facility’s capacity fell considerably below that (i.e., below 60% for two years running), MASSPOWER’s rejection of MMWEC’s must-run demand deprived MMWEC of the capacity for which it had bargained; and (2) that MMWEC has not demonstrated that switching to must-run would have lowered its per unit price.
B. MMWEC Was Deprived of the Power Supply Planning Benefits of Must-Run Operation
As entities supplying power to wholesale and retail customers, respectively, MMWEC and the participants strive to have an integrated resource plan. The purpose of such a plan is to supply customers with least cost electricity over time. An integrated resource plan includes a power supply portfolio, which typically includes power generated by facilities owned by the portfolio holder and power obtained through power purchase agreements.
The portfolio holder strives to have resources in place to supply a significant portion of its needs so as to avoid having to purchase power on the highly volatile spot market. In determining whether the portfolio is achieving the goal of providing least cost power over time, the portfolio resources are considered collectively, not separately. At any given time, some portfolio resources might be above market and others might be below market.
A long-term power purchase agreement allows the purchaser to avoid having to make short term or spot purchases on the spot market. For this reason, purchasers are willing to pay a premium to procure long-term contracts. Thus, including in a power supply portfolio a long-term contract that provides protection against volatility, even though expensive, is not unusual.
Indeed, achieving stability in the rates charged to customers is one of the fundamental tenets of ratemaking, and a primary goal of the participants. Because customer rates are based on utility costs, including the costs of procuring electricity supplies, stability in the costs of electricity is critically important to MMWEC and the participants in terms of their ability to offer stable rates to their customers, and to avoid rate volatility.
The participants included the electricity to be generated by the facility in their electricity supply portfolios as a source of base load electricity that would help the participants maintain reasonable and predictable rates for their customers.
*69 MASSPOWER’s refusal to must-run had a material and adverse effect on the interests of MMWEC and the participants because it subjected them to the uncertainty of purchasing electricity supplies on the volatile spot market, and thus deprived them of the ability to advance their goal of maintaining stability in the rates charged to their customers.
C.MMWEC Was Deprived of a Hedge Against Highly Volatile Spot Market Prices for Electricity, and of its Right to Overcome the Facility’s High Start Up Costs and High Bids
Because the participants commit the majority of their load in the day ahead market, they want their resources also to be in the day ahead market to allow hedging, i.e., to allow them to avoid having to make purchases in the volatile real time market.
The facility has the capability to cycle on and off, but it cannot start up or shut down quickly. It has a five-hour start-up time, a 12-hour minimum mn time, and then a shut-down time.
MMWEC contends that must-running would have overcome MASSPOWER’s high bids, and would have allowed the plant to clear in the day ahead market, providing a hedge against real-time electricity market power spikes or high price spikes.
MASSPOWER contends that MMWEC would have received no such benefit from must-run operation because “economic dispatch already provided MMWEC with a hedge against high day-ahead market prices for electricity. That is so because ISO-NE selected the MASSPOWER plant to run when the day-ahead market prices were high. MASSPOWER’s Post-Trial Submission, Proposed Finding No. 858.
In any event, MASSPOWER contends, because the participants committed their loads in the day-ahead market, not the real time market, as a general matter they were not left “exposed” to real-time market prices for energy, and so did not need a generation hedge in the real-time market.
MASSPOWER acknowledges, however, that “[instances where ISO-NE did not dispatch MASSPOWER where it might have made economic sense were a ‘much more minor phenomenon . . .’ ”— i.e., that such instances nevertheless did occur. Id, Proposed Finding No. 866.
MMWEC concedes that the plant’s long start-up and minimum run times, necessary even during “continuous” must-run operation, reduced its ability to be an effective hedge in the real time market.
On balance, the Court finds that MASSPOWER’s refusal to must-run was adverse to MMWEC in that it deprived MMWEC of a hedge against real-time price spikes, and that the effect on MMWEC was sufficiently Significant to be material.
D.MMWEC Was Deprived of Increased Efficiency of the Facility
The heat rate of the facility reflects its efficiency. Generally speaking, the more efficient the facility, the lower the heat rate.
When the facility was operating at about an 80% capacity factor, the average heat rate of the plant was about 8,268 Btu/kWh. In 2005, when the facility was being less frequently dispatched, the heat rate climbed to about 8,500 Btu/kWh.
In the period January through November 2006, when the facility was being even less frequently dispatched, the heat rate averaged approximately 8,660 Btu/kWh.
If MASSPOWER had must-run the facility, so that it was operating at or near capacity on a regular basis, and frequent start ups and shut downs were avoided, the facility heat rate would have been reduced, its efficiency would have improved, and the cost of electricity it generated would have been lower.
Heat rate is not an independent consideration, but is one input in the cost analysis. From that fact, MASSPOWER argues that “an improved heat rate and more efficiency matter only if it ultimately results in lower overall costs to MMWEC and the municipals.” Id, Proposed Finding No. 845.
MASSPOWER defines the issue too narrowly. Because, as found above, the participants included in their power supply portfolios “a long term contract that provides protection against volatility, even though expensive,” there was significant value to MMWEC in increasing the plant’s efficiency and thereby lowering that expense.
Accordingly, MASSPOWER’s refusal to must run was both material and detrimental to MMWEC’s interests because it deprived MMWEC of the benefits of a lowered facility heat rate and corresponding decrease in the price of electricity under the PPA.
E.The Participants Were Forced to Secure Expensive Replacement Contracts
MMWEC contends that, when the facility capacity factor declined and thereafter MASSPOWER refused to must-run, the participants were forced to cover for the electricity they were not receiving. They had two options: fixed rate contracts and heat rate contracts.
In fact, only Littleton, Holyoke, and Groton purchased such contracts: the remaining participants “covered” loss of electricity from MASSPOWER by going to the Pool. Littleton purchased heat rate contracts, Holyoke and Groton fixed price contracts.
MMWEC has not established that the “replacement” contracts purchased by Littleton, Holyoke, and Groton were more expensive than the lost electricity they were intended to cover. Accordingly, the Court finds that MASSPOWER’s refusal to must-run *70 did not materially and adversely affect MMWEC with regard to allegedly more expensive replacement contracts.
F. MMWEC was Deprived of Potential Economic Gains
MMWEC’s analysis of must-run operation showed that at a heat rate of 8,300, must-running the facility would have resulted in a gain to MMWEC of $142,000 for the nine-month retrospective period. MASSPOWER’s expert, Jeffrey Tranen, disputed that gain by pointing to an economic dispatch analysis which showed a gain of about $1 million over the 41-month period from August 2005 to December 2008. According to Tranen, that gain showed that MASSPOWER’s refusal to must-run saved MMWEC money.
MMWEC contends that any such savings would not have been material in view of the annual total revenues of the six participants. Moreover, MMWEC argues, MASSPOWER’s must-run analysis assumed inclusion of the capacity bonus factor. “It is utilization of that assumption that makes must run operation appear to be more expensive than economic dispatch would have been.” MMWEC’s Post-Trial Proposed Finding No. 348.
Appendix D to the PPA, “Adjustment to Monthly Capacity Charge,” provides for an adjustment to the Monthly Capacity Charge (as defined in the PPA) for any month in which the facility’s capacity exceeds eighty-five percent (referred to by the parties as the “capacity bonus”). Appendix D “establishes the formu-lae for determining the capacity charge adjustment factor (“CCAF”) to the Monthly Capacity Charge based on the monthly Equivalent Availability Factor and monthly actual dispatch hours ... of the Facility.” Ex. 11: 256.
Because MMWEC was required to pay to MASSPOWER a capacity bonus derived in part from “monthly actual dispatch hours,” the Court interprets Appendix D as applying during those periods when the facility was operating under economic dispatch, rather than must-run. Accordingly, the Court agrees with MMWEC that MASSPOWER’s failure to must-run the facility materially and adversely affected MMWEC because it resulted in a loss to MMWEC of economic gains (i.e., relief from making capacity bonus payments) that would have been significant, if relatively modest.
RULINGS OF LAW I. Breach of Contract
As stated above, the only issues to be determined after trial on MASSPOWER’s contract claim are (1) whether MASSPOWER’s breach of §4.3 of the PPA “materially and adversely” affected MMWEC; and, if not, (2) MASSPOWER’s damages. MMWEC has, in the several respects found above, carried its burden of proving that MASSPOWER’s breach of §4.3 did materially and adversely affectMMWEC,andtherefore that MASSPOWER’s breach entitled MMWEC to terminate the PPA under §7.1. Accordingly, MASSPOWER has failed to establish its contract claim.
II. Breach of the Implied Covenant of Good Faith and Fair Dealing
Count II of MASSPOWER’s complaint alleges that MMWEC breached the implied covenant of good faith and fair dealing. As stated above, the issues to be determined are (1) whether MMWEC unfairly or in bad faith exercised its right to demand must-run, and abused the legal process by filing the MMWEC Action, for the purpose of extracting a benefit to which it was not entitled—that is, a buy-out of the contract at a discounted price; and if so, (2) MASSPOWER’s damages.
The purpose of the implied covenant
is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract, . . . and that, when performing the obligations of the contract, the parties “remain faithful to the intended and agreed expectations” of the contract, Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). A breach occurs when one party violates the reasonable expectations of the other. Id. However, “[t]he scope of the covenant is only as broad as the contract that governs the particular relationship.” Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005). The covenant does not supply terms that the parties were free to negotiate, but did not, Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., supra at 388, nor does it “create rights and duties not otherwise provided” for in the contract, Ayash v. Dana-Farber Cancer Inst., supra, quoting Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., supra at 385.
Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007) (some citations omitted).
Thus, one party may not exercise a contractual right for the purpose of depriving another party of a right or benefit which the latter party reasonably expects under the contract. On the other hand, because the parties are free to negotiate and agree to terms of their contract, the covenant does not create rights and duties not otherwise provided for in the contract. Consequently, “(t]he duty of good faith and fair dealing concerns the manner of performance,” Uno Restaurants, Inc., at 385, rather than matters or conduct extraneous to performance. In Uno Restaurants, Inc., which involved the calculation of a sale price under a right of first refusal, the court was “reluctant to conclude that the covenant of good faith and fair dealing has, sub silentio, provided a specific form of protection that is not mentioned in the parties’ contract.” Id. at 386.
*71 As noted above, in the present case MASSPOWER argues that MMWEC exercised its right to demand must-run for the purpose of extracting a benefit to which it was not entitled—that is, a buy-out of the contract at a discounted price. There is no dispute that the condition precedent to MMWEC’s exercise of its right—Le., that the plant had been dispatched “at a capacity factor of less than sixty percent over a two year period,” §4.3—was established. Nor is there any dispute that, when negotiating the PPA, MASSPOWER was free to demand protection from the harmful consequences that might occur should MMWEC demand must-run at a time when must-run would be economically disadvantageous for MASSPOWER. For example, MASSPOWER could have demanded that the PPA allow MMWEC to demand must-run only when that was economically feasible, by some negotiated measure.
MASSPOWER did none of those things; instead, it negotiated what turned out to be a bad deal regarding must-run. So long as MMWEC has satisfied the prerequisite of §4.3, it had the right to demand must-run; that such a demand might also serve another purpose of MMWEC—that is, to obtain leverage over MASSPOWER in MMWEC’s effort to force a heavily discounted buyout—does not convert MMWEC’s demand into a breach of the implied covenant.
Where MASSPOWER could have, but did not, protect itself from the financial harm a must-run demand might cause, it cannot be heard to complain that it was forced to consider a less unattractive alternative.
Viewed in that light, MMWEC’s demand was not for a buyout to which it was not entitled under the PPA; rather, MMWEC’s demand was for MASSPOWER’s performance of a negotiated term of the PPA. Because that demand was not a ruse—the Court has found that MMWEC fully intended to follow through with having the facility declared must-run—MMWEC’s demand was made in good faith, and constituted fair dealing, so far as MMWEC’s manner of performing §4.3 is concerned.[15]
MASSPOWER’s second basis for claiming breach of the implied covenant is that MMWEC abused the legal process by filing the MMWEC Action for the purpose of obtaining a benefit to which it was not entitled under the PPA. The Court has concluded (see below) that MMWEC abused the legal process; such conduct may also support MASSPOWER’s claim under c. 93A. However, because the duty of good faith and fair dealing “concerns the manner of performance,” Uno Restaurants, Inc., at 385, and because MMWEC’s filing of its 2005 suit against MASSPOWER had nothing to do with the manner of MMWEC’s performance under the PPA, MASSPOWER has failed to prove that MMWEC’s abuse of process constitutes a breach by MMWEC of the covenant of good faith and fair dealing.
III. Abuse of Process Claim
The issues to be determined on MASSPOWER’s abuse of process claim are (1) whether MMWEC filed its 2005 Action for the purpose of disrupting the sale of MASSPOWER and thereby gaining leverage in its buy-out negotiations with MASSPOWER; and, if so, (2) MASSPOWER’s damages.
The Court has found that MMWEC brought the 2005 Action for the following purposes: (1) to pursue colorable claims that MASSPOWER was not operating as a baseload facility as required by the PPA, and that MASSPOWER was not entitled under the PPA unilaterally to sell its long-term fuel contracts; and (2) to disrupt MASSPOWER’s announced plans to sell the facility, so as to put pressure on MASSPOWER to resume buyout negotiations with MMWEC, and to gain leverage in such negotiations. The Court has further found that, had the latter purpose not existed, MMWEC would not have brought its 2005 Action.
Accordingly, the Court concludes that MASSPOWER has established the liability elements of abuse of process, i.e., that process was used for an ulterior or illegitimate purpose. Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775-75. However, the Court has also found that MASSPOWER has failed to prove that the costs of defending that litigation exceeded the “steep discount” which partners of MASSPOWER enjoyed as a result of the MMWEC Action. Because MASSPOWER has failed to prove its damages, its abuse of process claim also fails.
IV. Violation of G.L.c. 93A
The issues to be determined on MASSPOWER’s claim under c. 93A are (1) whether MMWEC unfairly or deceptively exercised its right to demand must-run for the purpose of extracting a benefit to which it was not entitled—that is, a buy-out of the contract at a discounted price; (2) whether MMWEC unfairly or deceptively exercised its right to demand must-run, and filed the MMWEC Action, for the purpose of disrupting the sale of MASSPOWER and thereby gaining leverage in its buy-out negotiations with MASSPOWER; and, if so, (3) MASSPOWER’s damages.
The Court’s findings above lead it to conclude that MMWEC did not unfairly or deceptively exercise its right to demand must-run for the purpose of extracting a benefit to which it was not entitled.
On the other hand, the Court has found that MMWEC’s motivation in filing its 2005 Action was to disrupt MASSPOWER’s announced plans to sell the facility, and thereby to put pressure on MASSPOWER to resume buyout negotiations with MMWEC, and to gain leverage in such negotiations. *72 MMWEC’s filing of its 2005 Action thus constituted not only an abuse of process, but also an unfair act under c. 93A.
As the Court has also found, however, MASSPOWER has failed to prove that MMWEC’s unfair act caused MASSPOWER to suffer a financial loss (i.e., that the reduction in its partners’ purchase price for the facility did not exceed the amount they paid in legal expenses for defense of the 2005 Action) .
While MASSPOWER has proved no financial harm, it has demonstrated that there was “some adverse effect on [it], even if it is not quantifiable in dollars,” Chapman v. Katz, 448 Mass. 519, 536 (2007) (citation omitted), and therefore that MASSPOWER is entitled to reasonable attorneys fees under c. 93A. That adverse effect is found in the substantial time and attention required by MASSPOWER employees to participate in the defense of the MMWEC Action, including participating in depositions and testifying at trial—time, that is, that they were not spending on the business of MASSPOWER. Moreover, c. 93A, §11 provides that “ [i]f the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, . . . irrespective of the amount in controversy, be awarded reasonable attorneys fees and costs incurred in said action.”
Accordingly, the Court will award MASSPOWER its reasonable attorneys fees and costs incurred in this action in respect of its prosecution of its c. 93A claim.
To the extent that the parties’ respective proposed findings of fact and rulings of law are inconsistent with the foregoing, they are denied.
ORDER FOR JUDGMENT
For the reasons set forth above, it is ORDERED that judgment shall enter as follows:
As to Count I, for breach of contract, judgment shall enter for defendant.
As to Count II, for breach of the implied covenant of good faith and fair dealing, judgment shall enter for defendant.
As to Count III, for violation of G.L.c. 93A, judgment shall enter for plaintiff, which upon motion shall be awarded its reasonable attorneys fees and costs of prosecuting that count.
As to Court IV, for abuse of process, judgment shall enter for defendant.

United States Power Fund, L.P., Project Finance Fund III, L.P., El Paso Corporation, and GS Power Holdings II LLC.

he MMWEC Action (1) involved both parties to the present case, (2) presents a virtually complete overlap with this case of certain facts and contentions surrounding the PPA, and (3) is the subject of MASSPOWER’s abuse of process claim here.

“NEPOOL refers to the New England Power Pool, a group of public and private utilities that utilized a central system operator to select electric generating facilities to meet demand for electricity.” Id. at 3, n.4.

Sic throughout.

So designated for ease of reference in discussion below.

Black’s Law Dictionary (7th ed., 1999) defines “material” as “significant, essential.”

Specifically: “If (i) Seller shall fail in any material respect to comply with ... or shall default in any material respects upon any obligation under this Agreement...” Id.

Specifically: ." . . and such failure materially and adversely affects Buyer..." Id.

I.e., the amount by which the “pendency of the [MMWEC Action] depressed the purchase price for the partnership interests, to the benefit of the current [MASSPOWER] partners," compared to the costs to MASSPOWER of that litigation. Id. at 4.

MASSPOWER’s Post-Trial Submission’s requested findings of fact number 1,142, spanning 294 pages: MMWEC’s Post-Trial Proposed Findings of Fact (MMWEC’s Proposed Findings) number 548, spanning 90 pages.

Hereafter, “Ex. X:_.”

Hereafter, Tr. x:__.

MMWEC’s intention that its “must-run” demand was for continuous operation is expressed also in its first notice of default, sent on May 18,2007, to Bentz: “MMWEC determined to request MASSPOWER, pursuant to Section 4.3, to self-schedule the Facility as a ‘must run’ unit, such that MMWEC receives the maximum possible energy from the Facility.” Ex. 154: 2168. The Court finds that the language “maximum possible energy” evidences MMWEC’s intent that, except for those periods when the plant had to be shut down (in Beauregard’s words quoted above, “times it had to come offline”), MASSPOWER was to run the plant continuously.

Interestingly, MASSPOWER’s May 11, 2007 response to MMWEC’s must-run demand states that “the timing of the [must-run] request is quite curious, coming . . . only days after a change in the ownership of the MASSPOWER partners." Ex. 261: 6062 (emphasis added).

While the Appeals Court’s ruling on MMWEC’s claim (in the MMWEC Action) that MASSPOWER breached the implied covenant of good faith and fair dealing addresses a set of facts not relevant to the present case, it does provide guidance with regard to MASSPOWER’s claim here that MMWEC breached the implied covenant. In the MMWEC Action, MMWEC claimed that MASSPOWER’s breach of the implied covenant lay in its failure to operate the facility as a baseload unit (i.e., a unit operating “nearly continuously ... 75 to 95 percent of the time,” Appeals Court decision, at 3), and its unilateral termination of its contracts for fuel to operate the plant. The trial judge ruled that “because Masspower acted in accordance with its contractual obligations, it did not breach the implied covenant.” Id. at 10-11. The Appeals Court agreed:
"While it is true that the purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract... the scope of the covenant is only as broad as the contract that governs the particular relationship. The covenant does not supply terms that the parties were free to negotiate, but did not.
Id. at 11 (citations and quotation marks omitted).